**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| AMEE JO BUTCHER, | CASE NO. 5:23-CV-02451 |
| Plaintiff, | DISTRICT JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Amee Jo Butcher ("Plaintiff" or "Ms. Butcher") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

### I.        Procedural History

Ms. Butcher filed her SSI application on June 5, 2020, alleging disability beginning July 20, 2002. (Tr. 161.) She asserted disability due to lumbar spondylolisthesis, fracture of body vertebra, post-traumatic stress disorder ("PTSD"), and spinal stenosis. (*Id.*) Her application was denied at the initial level (Tr. 186, 191) and upon reconsideration. (Tr. 202.) She then requested a hearing. (Tr. 222.)

1

On June 3, 2021, a hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 30-56.) The ALJ issued an unfavorable decision on June 15, 2021, finding Ms. Butcher had not been under a disability since June 5, 2020, the date the application was filed. (Tr. 13-29.) Plaintiff requested review of the decision by the Appeals Council. (Tr. 277-79.) The Appeals Council denied her request for review on June 9, 2022. (Tr. 1-7.)

Plaintiff appealed to the U.S. District Court, Northern District of Ohio, and upon joint stipulation of the parties, the case was remanded to the Commissioner for further administrative proceedings. (Tr. 792.) On remand, the ALJ held a second hearing on October 5, 2023. (Tr. 725-60.) The ALJ issued a second unfavorable decision on October 23, 2023, finding Ms. Butcher had not been under a disability since June 5, 2020. (Tr. 704-24). The ALJ's second decision became final on December 24, 2023, and Plaintiff timely filed the pending appeal on December 26, 2023.[1] (Tr. 702; ECF Doc. 1.) The matter is now fully briefed (ECF Docs. 8, 9).

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Butcher was born on September 22, 1972, and was 47 years old on the alleged disability onset date, making her a younger individual under Social Security regulations on June 5, 2020, the date the application was filed. (Tr. 716.) Ms. Butcher subsequently changed age category to closely approaching advanced age. (*Id*. (citing 20 C.F.R. § 416.963).) She has at

---

[1] 20 C.F.R. § 416.1484 provides that "when a case is remanded by a Federal court for further consideration . . . the decision of the administrative law judge or administrative appeals judge will become the final decision of the Commissioner after remand . . . unless the Appeals Council assumes jurisdiction of the case." 20. C.F.R. § 416.1484(a). Thus, when a claimant does not file exceptions and the Appeals Council does not assume jurisdiction without exceptions being filed, "the decision of the administrative law judge becomes the final decision of the Commissioner after remand." 20 C.F.R. § 416.1484(d). There is no indication Plaintiff filed exceptions or that the Appeals Council otherwise assumed jurisdiction. Thus, the ALJ's October 23, 2023 decision is the final decision of the Commissioner for review by this Court.

least a high school education.  (*Id.*)  Ms. Butcher has a limited work history since the alleged

onset of her disability (Tr. 314, 527, 538) and has not worked since June 5, 2020.  (Tr. 706.)

**B.      Medical Evidence**

Although the ALJ identified numerous severe physical and mental impairments (Tr. 706),

Ms. Butcher bases her appeal solely on the evidence relating to her use of a cane.  (ECF Doc. 8).

The evidence summarized herein is accordingly limited to records relating to Ms. Butcher's

chronic back pain and spinal conditions.

**1.      Relevant Treatment History**

Ms. Butcher was involved in two motor vehicle accidents approximately 20 years ago

that resulted in multiple surgeries on her back.  (Tr. 615.)  Her remote surgical history relating to

her back includes a T11 to L4 fusion in 2002, spinal cord stimulation and removal in 2005 and

2007, and a decompression at L4-5 with hardware removal in 2017.  (Tr. 420, 982.)  After a

2019 consultation with her orthopedic surgeon, Rajiv V. Taliwal, M.D., Ms. Butcher underwent

a surgical fusion L4-L5, posterior decompression revision, L4-L5, L5-S1, and local spinous

process bone graft and allograft on March 5, 2020.  (Tr. 376, 384.)  Upon discharge, Ms. Butcher

was diagnosed with continuing lumbar spondylolisthesis with lumbar spinal stenosis.  (Tr. 378.)

After Ms. Butcher's surgery, Dr. Taliwal prescribed medications for pain control.  (Tr.

377.)  Ms. Butcher's medication list remained generally consistent throughout her medical

history, with minimal modifications.  It included oxycodone and hydrocodone, Lyrica, Baclofen,

Flexeril, and a Lidoderm patch to treat her pain and nerve damage.  (*E.g.*, Tr. 500, 964, 981,

1012-13, 1995.)  Ms. Butcher has also consistently taken anti-depressants and various

medications to treat her other health conditions, like high blood pressure.  (*Id.*)

At a post-surgery follow-up appointment with Dr. Taliwal on March 20, 2020, Ms. Butcher reported slightly greater back pain than before her surgery.  (Tr. 420.)  The pain was in her lower back and radiated across her buttocks.  (*Id*.)  Dr. Taliwal noted that Ms. Butcher ambulated without difficulty and presented as balanced and upright upon examination.  (Tr. 422.)  On May 1, 2020, Ms. Butcher began to report some improvement in her pain and less weakness in her legs, but still described her pain as constant.  (Tr. 415.)  Dr. Taliwal again noted that Ms. Butcher ambulated without difficulty and presented balanced and upright upon examination.  (Tr. 417.)  He referred Ms. Butcher to physical therapy.  (Tr. 418.)

On June 26, 2020, Ms. Butcher began physical therapy with Brian T. Sabo, PT, at Crystal Clinic Orthopedic Center in Barberton, Ohio.  (Tr. 410.)  She reported difficulty walking, holding herself up, shopping, gardening, and doing housework.  (*Id*.)  She also stated that she occasionally used a cane while walking.  (*Id*.)  Ms. Butcher participated in therapy with ongoing pain in the low back area and variable pain in the lower extremity.  (Tr. 412.)  PT Sabo noted that Ms. Butcher had full or nearly full strength in her lower extremities.  (*Id.*)

Ms. Butcher attended another physical therapy session with PT Sabo on July 1, 2020.  (Tr. 406.)  She continued to report back pain and leg soreness, mostly on the right side.  (*Id*.)  PT Sabo noted that Ms. Butcher demonstrated "good balance on a compliant surface without use of upper extremities to correct loss of balance."  (Tr. 408.)  Ms. Butcher had three more physical therapy sessions in July 2020, with little change in her condition.  (Tr. 395-405.)  On July 14, 2020, she reported soreness after going camping and walking up and down hills.  (Tr. 404.)

In August 2020, Ms. Butcher saw Gina M. Solomon, APRN-CNP, at the Crystal Clinic Orthopedic Center, complaining of increased lower back pain after tripping while gardening.  (Tr. 494.)  An x-ray of Ms. Butcher's back showed the multilevel degenerative disc space

4

narrowing and chronic compression deformity at L1 which had appeared on previous imaging, but it revealed no acute fracture or other concerning findings. (Tr. 492.)  CNP Solomon's physical examination noted some stiffness and pain with range of motion, but Ms. Butcher ambulated without difficulty, demonstrated a normal gait, maintained full strength in the lumbar and lower extremities, and had sensation in the lower extremities. (Tr. 496-97.)  She did not use an assistive device when walking. (Tr. 496.)

On November 20, 2020, Ms. Butcher followed-up with Dr. Taliwal. (Tr. 500.)  She reported continued and constant pain in her low back that radiated to her hips and buttocks. (*Id*.)  She also reported having fallen a couple of times since May 2020, saying her back pain worsened after her falls. (*Id*.)  Dr. Taliwal again noted that Ms. Butcher ambulated without difficulty, presented as balanced and upright, and had full strength in her legs. (Tr. 502.)  He also noted stiffness in the lumbar spine and pain with range of motion, particularly extension. (*Id*.)  Ms. Butcher saw Dr. Taliwal again in March 2021, continuing to report constant low back and right leg nerve pain. (Tr. 621.)  She ambulated without difficulty and had full strength in her legs. (Tr. 623.)  Dr. Taliwal reviewed x-rays of Ms. Butcher's back in November 2020 and March 2021, finding good alignment in Ms. Butcher's lumbar spine with no instability or fracture. (Tr. 499, 620).

On April 19, 2021, Ms. Butcher began attending physical therapy again, seeing William Nicholson, PT, at the Crystal Clinic Orthopedic Center. (Tr. 615.)  She reported difficulty with certain tasks, such as cooking, walking 30 minutes, reaching forward to do dishes, and home decorating. (Tr. 615, 617.)  PT Nicholson conducted a physical examination and found that Ms. Butcher's right thigh had minimal lumbar flexion, with some diminished strength in the gluteus

medius and hip adductors bilaterally.  (Tr. 617.)  During this appointment, Ms. Butcher had to hold onto the mat table and put her arms on her legs for support to stand.  (*Id*.)

Ms. Butcher attended another therapy session with PT Sabo on April 23, 2021.  (Tr. 611.) She performed new exercises with increased low back pain, soreness, and significant fatigue. (Tr. 613.)  She reported relief after assuming a decompressive position and applying heat to her lumbar spine.  (*Id*.)  PT Sabo noted that Ms. Butcher had significant weakness in her lumbar and abdominal muscles, causing pain with dynamic movements and transfers.  (*Id*.)  At Ms. Butcher's next appointment on April 27, 2021, she tolerated an increased duration of ambulation on the treadmill and had good tolerance to ball workouts with stand-by assist.  (Tr. 638.)

Parallel to physical therapy and appointments with her surgeon, Ms. Butcher regularly saw Samer Narouze, M.D., and Greg Carpenter, PA-C, at Western Reserve Hospitals for pain management between January 2020 and February 2023.  (Tr. 916-1009, 1966-2001).  From January to October 2020, Ms. Butcher had near monthly pain management appointments.[2]  (Tr. 969, 973, 977, 981, 990, 996, 1001, 1006.)  At Plaintiff's first appointment in January 2020, she reported using a cane "intermittently."  (Tr. 981.)  Dr. Narouze diagnosed her with chronic pain syndrome, radiculopathy lumbosacral region, spondylosis without myelopathy or radiculopathy lumbar region, and multiple mental health problems.  (Tr. 982-83.)  Treatment notes from follow-up appointments consistently document complaints of ongoing low back pain with referred pain to the buttocks and lateral hips, greater on the right.  (Tr. 969, 973, 977, 981, 990, 996, 1001, 1006.)  Ms. Butcher regularly reported numbness in the lower extremities, which was overall stable with no reports of worsening.  (Tr. 969, 973, 977, 1006.)  Physical examinations

---

[2] At her January 2020 appointment, Ms. Butcher was instructed to follow up after her March 2020 surgery.  (Tr. 983.)  Accordingly, there is a gap in the pain management records in February and March 2020.

throughout 2020, while limited due to the COVID-19 pandemic, (Tr. 977-78, 973-74), consistently recorded decreased range of motion of the lumber spine with increased pain on extension and rotation.  (Tr. 970, 991, 997, 1002, 1008.)  After surgery and throughout 2020, Ms. Butcher reported using a cane rarely or not at all.  (Tr. 969, 973, 977, 990, 996, 1001, 1006.) During this period, Dr. Narouze and PA Carpenter always observed her to ambulate unassisted but with a slow gait.  (Tr. 970, 982, 991, 997, 1002, 1008.)

Ms. Butcher does not appear to have attended a separate pain management appointment in November 2020, although she saw Dr. Taliwal that month as discussed above.  (Tr. 500.)  In December 2020, Dr. Narouze administered a sacroiliac joint injection to treat Ms. Butcher's back and hip pain.  (Tr. 987.)  Ms. Butcher later reported that this procedure helped her pain levels. (Tr. 937.)  She then continued with pain management appointments at Western Reserve Hospital every four to six weeks from January to October 2021.  (Tr. 916, 921, 927, 932, 937, 944, 949, 954, 959, 964.)  Treatment notes from these appointments document Ms. Butcher's ongoing low back, buttocks, and hip pain, greater on the right.  (*Id*.)  Ms. Butcher continued to report numbness in the lower extremities, with no reports of worsening.  (*Id*.)  Physical examinations at these appointments consistently noted positive tenderness over the thoracic and lumbar paraspinal muscles, muscle tension, sensitivity to light palpation, continued decreased range of motion of the lumbar spine with increased pain, and tenderness to palpation over the SI joints and lateral hips.  (Tr. 918, 923, 929, 934, 946, 956, 961, 966.)  From January through July 2021, Dr. Narouze and PA Carpenter observed that Ms. Butcher walked unassisted, with a slow gait. (Tr. 918, 923, 929, 939, 966.)  But between August 2021 and October 2021, PA Carpenter noted at four office visits that Plaintiff walked with a cane.  (Tr. 946, 951, 956, 961.)

7

The next pain management record is from a year later, in October 2022, when Dr. Narouze administered a nerve block to Ms. Butcher's right thigh.[3]  (Tr. 2000.)  The records next indicate that Ms. Butcher returned to PA Carpenter for pain management on February 2, 2023.  (Tr. 1996.)[4]  She reported continued lower back pain bilaterally with referred pain to the buttocks and lateral hips.  (*Id*.)  She told PA Carpenter that she used a cane for ambulation (*id*.), but PA Carpenter observed that she walked slowly but unassisted (Tr. 1998).

On February 2, 2023, Ms. Butcher was also evaluated by neurologist Roswell Dorsett, DO.  (Tr. 1950.)  An updated MRI of the lumbar spine revealed multilevel disc bulges with postsurgical changes and facet osteoarthritis at the lumbosacral level with a small left-sided synovial cyst encroaching upon the central canal and left neural foramen.  (Tr. 1956.)  Dr. Dorsett noted decreased sensation over the posterior waist and hyperesthesia in the right L3-4 cutaneous distribution and femoral nerve distribution, but also observed that Plaintiff's motor tone, strength, coordination, and gait were all normal.  (Tr. 1951.)  At a follow up visit on March 16, 2023, however, Dr. Dorsett observed that Ms. Butcher ambulated with a cane.  (Tr. 1940.)  Her physical examination findings continued to note normal motor tone, strength, and coordination.  (*Id*.)  On May 5, 2023, Ms. Butcher saw Dr. Narouze for a lumbar spinal epidural steroid injection.  (Tr. 1993.)

Ms. Butcher received Spravato or Ketamine infusions beginning in or about August 2022 and continuing through at least September 2023 with Carlos Molina, M.D. at Ascend Health in Akron, Ohio.  (Tr. 1011-1276, 1658-1938 (detailing infusion appointments).)  She had

---

[3] Another October 2022 record from Western Reserve Hospital notes that Ms. Butcher had last been admitted in December 2021, but there are no notes from this appointment in the record.  (Tr. 1985.)

[4] The record notes this was a two-month follow-up, but there is no corresponding appointment summary from December 2022 in the record.  (Tr. 1995.)

four or five infusions per month in fall 2022, one or two per month from December 2022 through May 2023, and three or four per month through summer 2023.  (*Id.*)  The record suggests these infusions were primarily intended to address Plaintiff's mental health, but they also treated her pain.  (*See e.g.*, Tr. 733, 1011, 1670, 1913.)  The appointment notes from 2022 and early 2023 did not include relevant observations on Ms. Butcher's mobility (Tr. 1060-68, 1078, 1661-1808, 1862-96, 1961) besides occasionally stating "motor activity intact" (Tr. 1678, 1871).  At Plaintiff's infusion appointments in July and August 2023, Dr. Molina conducted a physical examination before administering the infusions and noted that Ms. Butcher ambulated without assistance.  (Tr. 1015, 1022, 1031, 1039, 1052**.)**

The undersigned summarizes Ms. Butcher's mental health treatment only insofar as it touches on her physical symptoms and use of a cane.  Ms. Butcher received regular mental health treatment and counseling services at Portage Path Behavioral Health Center from February 2020 through at least September 2023.  (Tr. 437-75, 505-09, 1294-1648.)  In June and August 2021, Ms. Butcher's mental health providers sometimes noted that her gait was normal and did not indicate that she walked with a cane.  (Tr. 1300, 1306, 1432, 1454, 1489, 1516, 1624.)  But James Tudhope, P.M.H.N.P.-BC, observed that she used a cane in November 2021.  (Tr. 1315.)  Mental health treatment records from May 2022 and May 2023 included Plaintiff's self-reported use of a cane alongside other self-reported problems, such as PTSD from motor vehicle accidents, lack of income, and her pending application for disability.  (Tr. 1401, 1599).

## 2.    Opinion Evidence

### i.    State Agency Medical Consultants

On August 17, 2020, non-examining, state agency medical consultant Elizabeth Das, M.D., completed a Physical RFC Assessment of Ms. Butcher.  (Tr. 171-72.)  Dr. Das opined that

Ms. Butcher had the following residual functional capacity: she could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; she could stand and/or walk six hours in an eight-hour workday and sit for six hours in an eight-hour workday; she could never climb ladders, ropes or scaffolds and could occasionally climb ramps and stairs; she could occasionally stoop, crouch, and crawl; she was able to balance and kneel; she was able to push or pull with both her upper and lower extremities.  (*Id*.)  Dr. Das observed that physical evaluations in the record showed a normal, unassisted gait and full strength. (*Id*.)  She found that Ms. Butcher required no environmental, manipulative, communicative, or visual limitations.  (*Id*.)

On February 24, 2021, non-examining, family medicine reviewer, Maria Congbalay, M.D., affirmed Dr. Das's opinion as written, except she increased Ms. Butcher's crouching ability from occasional to frequent.  (Tr. 180-81.)

### ii.     Functional Capacity Evaluation

Dr. Taliwal referred Ms. Butcher for a functional capacity evaluation by Jim Micali, PT, CSCS, in February 2021.  (Tr. 626-35.)  PT Micali concluded that Ms. Butcher could perform no more than sedentary exertional activities, noting that her primary functional difficulty relates to "low sitting and standing duration tolerance."  (Tr. 626.)  Specifically, PT Micali found that Ms. Butcher could only sit for six minutes before aggravating her lower back pain.  (Tr. 631.)  He opined that she was limited to occasional fingering, handling, and reaching.  (*Id*.)  PT Micali conducted a 10-meter walk test, which measures how fast a worker can safely walk at usual and fast speeds.  (*Id*.)  Plaintiff could only walk 0.46 m/s at a usual walk pace, placing her in the bottom 33.3% percentile of workers.  (*Id*.)  She experienced pain during this test.  (*Id*.)  PT Micali opined that Plaintiff could manage her personal care independently and perform

household chores with much difficulty and occasional assistance.  (Tr. 629.)  Ms. Butcher drove herself to the evaluation.  (*Id*.)

C.     **Function Report**

Plaintiff completed an Adult Function Report on July 23, 2020.  (Tr. 314-321.)  She reported living alone and was limited from work due to lower spine and nerve damage reducing her mobility and stamina.  (Tr. 314.)  She had tried to work from 2015 to 2018 but was unable to function without rest due to the pain.  (*Id*.)

With respect to activities of daily living, Ms. Butcher reported attending to pets and hygiene with some limitations.  (Tr. 315.)  A friend bought cat food and litter for her because the bags were too heavy for her to carry.  (*Id*.)  She reported difficulty bathing, shaving, and cooking due to pain and limited mobility.  (*Id*.)  She did not need special reminders or help to care for herself or take medication.  (Tr. 316.)  Before her illness, injury, or condition, Ms. Butcher was "capable of doing whatever [she] wanted."  (Tr. 315.)  With her conditions, she could cook easy meals and perform light housework by breaking tasks into steps and resting between each step.  (Tr. 316.)  She received help from others for detailed cleaning or moving things.  (*Id*.)

Ms. Butcher reported severe PTSD about driving.  (Tr. 317.)  She only drove herself to medical appointments and physical therapy.  (*Id*.)  She did most of her shopping online or had people bring things to her.  (*Id*.)  She went to the store alone once or twice a month due to panic attacks while driving and her inability to move through the store.  (*Id*.)

Ms. Butcher was physically and mentally able to pay bills, count change, handle a savings account, and use a checkbook/money order.  (*Id*.)  She had hobbies and interests like sewing, crocheting, crafting, drawing, and watching television.  (Tr. 318.)  She was limited in these activities by whether she could sit down and how well she felt sitting at a desk.  (*Id*.)  She visited friends, parents, and siblings two or three times a month for meals or other low-

movement activities.  (*Id*.)  She needed others to remind her of plans, or she wrote reminders in her calendar.  (*Id*.)  She usually needed someone to accompany her when she left the house but did things alone on days when she felt good.  (*Id*.)

Ms. Butcher said she was limited by her conditions in all areas except for talking, hearing, seeing, memory, understanding, following instructions, using hands, and getting along with others. (Tr. 319.)  She indicated that any movement irritated her nerve damage and spinal fusion, causing pain.  (*Id*.)  Pain would break her concentration and affected her ability to complete projects.  (*Id*.) Ms. Butcher is right-handed.  (*Id*.)  She said she could walk about one-half mile before needing to rest for a couple of minutes.  (*Id*.)  She noted she received a cane from the hospital for help at home but said she only used it if she had to walk a lot.  (Tr. 320.)

**D.      Hearing Testimony**

**1.      Plaintiff's Testimony at June 2021 Hearing**

At her June 3, 2021 administrative hearing, Ms. Butcher testified in response to questioning by the ALJ and her counsel.  (Tr. 30-50.)  She said she lived by herself and had a driver's license.  (Tr. 36.)  She graduated from high-school, and she is right-handed.  (*Id*.)

Ms. Butcher testified she was taking Fluoxetine for depression, Trazadone for sleep, and Hydrocodone, Norco, and Meloxicam for pain.  (Tr. 37.)  She was not experiencing any side effects from those medications besides constipation.  (Tr. 38.)

Ms. Butcher confirmed she has had five back surgeries, the most recent in March 2020. (*Id*.)  She described her lower back pain as constant.  (*Id*.)  She said she could dress herself, but that any pressure on her hips or lower back caused sparking and burning pain due to nerve damage.  (*Id*.)  Ms. Butcher's pain medication helped somewhat with the sparking, but her pain

"was getting worse."  (Tr. 39.)  To manage the pain, Ms. Butcher had tried injections, nerve stimulators, and having rods put in her back.  (*Id*.)  Nothing had helped long-term.  (*Id*.)

When the ALJ asked Ms. Butcher whether she used a cane or walker, she said "No, I have tried it . . . I found that using a cane I end up putting too much pressure on one side or the other.  And plus I just hate having to constantly carry it[.]"  (Tr. 40.)  Ms. Butcher stated that she could stay on her feet for 30-60 minutes before needing a break.  (*Id*.)  She could not remain in any position for long because sitting put pressure on her hips and lower back.  (*Id*.)

Ms. Butcher reported feeling stressed and overwhelmed easily due to extreme anxiety. (Tr. 42.)  She continued to seek mental health treatment and take medications, but they did not seem to help because she was "weighed down" by her pain.  (*Id*.)  Due to anxiety and panic attacks, Ms. Butcher did not drive unless it was absolutely necessary.  (Tr. 43.)  She later acknowledged that she could drive herself to the store, but said she dreaded it and had difficulty walking around the store.  (Tr. 46.)  She was working with her counselor to become more responsible for herself and had recently started training to work a crisis hotline.  (Tr. 43-44.)

When asked to describe a typical day, Ms. Butcher said she would stretch first thing in the morning to ease her soreness.  (Tr. 44.)  If she had no medical appointments, she might not do anything until noon, when she would "force [her]self" to clean or work on an art project.  (Tr. 45.)  A friend helped Ms. Butcher complete basic house cleaning once a week.  (*Id*.)

Ms. Butcher said she drove herself to North Carolina to pick up her son for Thanksgiving in December 2019.  (Tr. 47.)  She explained that she could drive that distance despite her pain and anxiety because she would do anything for her kids, even things she felt she could not do for herself.  (Tr. 48.)  She also attended her cousin's wedding in Maine in May 2020.  (Tr. 46.)  She used a wheelchair to navigate the airport and did not feel anxiety about flying.  (Tr. 47.)

13

Ms. Butcher reported difficulty using the stairs in her house and considered it a form of exercise.  (Tr. 48-49.)  Since the March 2020 surgery, she said bathing and dressing herself had been difficult due to reduced flexibility.  (Tr. 49.)  Ms. Butcher had a shower chair, handles, and other safety equipment in her bathroom that allowed her to care for herself.  (*Id*.)

Ms. Butcher testified that going from sitting to standing was one of the most difficult things to do.  (*Id*.)  She used the arms of a chair or pulled on something to stand.  (Tr. 49-50.)  She needed support to bend over and pick up something from the floor, and doing so was very painful.  (Tr. 50.)

### 2. Plaintiff's Testimony at October 2023 Hearing

At her October 5, 2023 hearing, Ms. Butcher confirmed that she still lived alone.  (Tr. 732.)  She was taking numerous prescription medications for blood pressure, anxiety, depression, sleep, attention deficit hyperactivity disorder ("ADHD"), and pain.  (Tr. 732-33.)  Additionally, she said she had begun receiving Ketamine and Spravato infusions to treat anxiety, depression, and pain.  (Tr. 733.)  She was not experiencing side effects from the medications, other than constipation from the pills and blurriness from the infusions.  (*Id*.)

Ms. Butcher confirmed she underwent back surgery in 2002, 2017, and 2020.  (Tr. 734.)  After the 2017 surgery, she said she experienced a significant loss of strength and balance issues.  (Tr. 735.)  She had to push her hands into her lower back when walking to balance herself.  (*Id*.)  This caused a lot of pain and exhausted her.  (*Id*.)  Ms. Butcher described her pain as constant.  (*Id*.)  Her pain medication helped her feel "a little bit better," allowing her to do household chores, but she quickly became exhausted and felt pain.  (Tr. 735-36.)  Ms. Butcher said she could only stand or walk for a few minutes before needing to sit and rest.  (Tr. 736.)  She could sit in a reclined position on a soft surface for "awhile" if she shifted often from one side of her

14

body to the other.  (Tr. 736-37.)  She avoided sitting in "regular" chairs, such as desk chairs, because leaning forward over a desk or a table strained her back too much.  (Tr. 737.)

Ms. Butcher had recently seen a neurologist.  (*Id*.)  Her surgeon and neurologist believed her back problems stemmed from arthritis and "a bony growth on her spine that puts pressure on the nerves and causes them to be inflamed."  (*Id*.)  The neurologist suggested injections to treat sensitive and inflamed skin along the front of Ms. Butcher's right side.  (Tr. 737-38.)  Ms. Butcher testified that the area from her right breast to her right groin was extremely sensitive, and she could not even rest her arm against her side without feeling pain.  (Tr. 738.)  She was "constantly moving" to find a comfortable position, and she avoided tight-fitting clothing.  (*Id*.)

Ms. Butcher testified that she used a cane when she had to walk any distance without a grocery cart in front of her.  (*Id*.)  She said she had used a cane "off and on for maybe ten years." (*Id*.)  When asked about her 2021 testimony that she did not use a cane, she explained that as her conditions progressed, she no longer had a choice about using a cane.  (Tr. 739.)

Ms. Butcher testified she was still seeing a counselor for depression, anxiety, and PTSD. (*Id*.)  She did not feel her medications were working very well.  (*Id*.)  She felt extreme exhaustion and became very anxious at the thought of leaving her house.  (Tr. 740.)

When asked to describe a typical day, Ms. Butcher said she would wake up, take her medications, and rest until she had to get up and do something.  (*Id*.)  She completed tasks in pieces, taking breaks to rest.  (Tr. 740-41.)  Ms. Butcher was able to clean her floors sometimes and do her laundry once a week.  (Tr. 741.)  She did not cook often.  (*Id*.)

Ms. Butcher said she could drive but explained that she did not drive unless she absolutely had to because she was extremely anxious about driving.  (*Id*.)  She did much of her shopping online, and friends often brought her things she needed.  (Tr. 742.)  When asked about

15

her prior testimony about using a shopping cart to support her back, Ms. Butcher explained that she would go to the store herself to shop once every couple of months, if she had a "halfway decent day." (*Id.*)  At the store, she would use the shopping cart to hold herself upright and lean forward to rest on the cart when she felt tired.  (Tr. 748.)  This leaning forward position was painful, but it calmed her exhaustion from holding herself upright.  (*Id.*).

Ms. Butcher said she no longer volunteered with the suicide hotline because her documentation skills were insufficient, and they let her go.  (Tr. 742-43.)  She had only worked there for a couple of months.  (Tr. 743.)

Ms. Butcher traveled to North Carolina in spring 2023 to visit her sister.  (*Id.*)  Her sister's children were graduating, and her sister's husband was retiring.  (*Id.*)  Ms. Butcher traveled with a companion.  (*Id.*)  While in North Carolina, she did not attend the graduation or retirement ceremonies, just visited with family afterwards.  (Tr. 744.)

Ms. Butcher said she could reach out in front of her to grab a glass from a cupboard.  (Tr. 748-49.)  She could carry a gallon of milk from the car to the house if she had something to balance herself.  (Tr. 749.)  When she used a cane, she used it on the left side.  (Tr. 750.)  She could bathe and dress herself but found it exhausting.  (*Id.*)  She limited showering to days when she had nothing else to do so she could rest afterwards.  (*Id.*)  She could use her stairs but said she "kind of crawl[ed] up them."  (Tr. 751.)  She could go to her basement to do laundry.  (*Id.*)

### 3.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the June 2021 hearing.  (Tr. 51-55.)  He classified Ms. Butcher's past relevant work as automative technician exhaust emissions, DOT number 620.281-014, light work skilled, with an SVP of 7.  (Tr. 52.)  A different VE testified at the October 2023 hearing.  (Tr. 753-60.)  That VE testified that a hypothetical individual of

Plaintiff's age, education, and work experience with the functional limitations described in the ALJ's residual functional capacity determination could not perform Ms. Butcher's past relevant work but could perform representative positions in the national economy, including cleaner/housekeeper, merchandise marker, and routing clerk.  (Tr. 755.)  She also testified that it would preclude competitive employment if the person would be off-task 33% of time, unable to sit for more than three hours in the workday, unable to walk more than one hour in ten-minute increments or absent more than twice a month.  (Tr. 756-57.)  Upon questioning by Plaintiff's attorney, the VE testified that if the hypothetical person described by the ALJ needed to use a cane for balance and ambulation, light exertional jobs would not be available to her.  (Tr. 759.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

17

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.      The ALJ's Decision

In his October 23, 2023 decision, the ALJ made the following findings:[5]

1.      The claimant has not engaged in substantial gainful activity since June 5, 2020, the application date.  (Tr. 706.)

2.      The claimant has the following severe impairments: lumbar degenerative disc disease status post-surgical intervention; major depression; PTSD; ADHD; anxiety disorder.  (*Id.*)

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 708.)

---

[5] The ALJ's findings are summarized.

4.   The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except: the claimant can never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs; she can frequently crouch and can occasionally stoop and crawl; she can perform simple, routine tasks that involve no more than simple work-related decision making; she can have occasional and superficial interaction with others, with superficial defined as work that does not involve arbitration, negotiation or confrontation; she cannot direct the work of others or be responsible for the safety or welfare of others; she cannot perform assembly line work or work that involves strict production quotas; and, she can handle occasional workplace changes that are gradual and explained in advance. (Tr. 710.)

5.   The claimant is unable to perform any past relevant work.  (Tr. 716.)

6.   The claimant was born in 1972 and was 47 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. § 416.963).  (*Id*.)

7.   The claimant has at least a high school education.  (*Id*.)

8.   Transferability of job skills is not material to the determination of disability.  (Tr. 717.)

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cleaner housekeeper, merchandise marker, and routing clerk.  (*Id*.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from June 5, 2020, through the date of the decision on October 23, 2023.  (Tr. 718.)

## V.   Plaintiff's Arguments

In her sole assignment of error, Ms. Butcher argues that the ALJ failed to develop the record by not ordering a consultative examination to determine whether her use of a cane was medically necessary.  (ECF Doc. 8, pp. 1, 10.)

# VI.    Law & Analysis

## A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004)).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## A.    Sole Assignment of Error: Whether the ALJ Failed to Properly Develop the Record

In her sole assignment of error, Ms. Butcher argues that the ALJ failed to properly develop the record because he did "not order[] a consultative examination of Ms. Butcher to determine whether her use of a cane is medically necessary."  (ECF Doc. 8, pp. 1, 10.)  She asserts that a need for a cane is "outcome determinative" because the VE testimony precludes light exertional work and directs a finding that she is disabled based on her age if it is "medically necessary" for her to use a cane for balance and ambulation.  (ECF Doc. 8, pp. 10-11 (citing 20 C.F.R. § 416.1563(c)(d) and Tr. 759).)  She then argues the ALJ had a duty to further develop the record—by ordering a consultative examination or obtaining an updated opinion from her treatment providers—because he relied on outdated medical opinions by the state agency medical consultants and made erroneous observations that the "only documented use of a cane"

21

by Ms. Butcher was in March 2023, when in fact the medical records post-dating the 2020 and 2021 medical opinions contain "nine subsequent references to Plaintiff's cane use" (*id.* at p. 14).

As to the ALJ's duty to develop the record, the Commissioner argues that the ALJ acted within his discretion when he did not further develop the record, noting that Ms. Butcher was represented by counsel and did not request further development.  (ECF Doc. 9, pp. 1-2.)  The Commissioner also argues the ALJ's misstatement regarding cane usage does not deprive the decision of the support of substantial evidence because Ms. Butcher cannot show based on clinical evidence in the record that the cane was "medically necessary."  (*Id.* at p. 1.)

For the reasons set forth below, the undersigned finds no merit in Ms. Butcher's argument that the ALJ had a duty to develop the record by ordering a consultative examination to assess whether Ms. Butcher's use of a cane was "medically necessary," notwithstanding the ALJ's misstatements regarding the number of documented uses of a cane in the record.

### 1. ALJ had No Heightened Duty to Develop the Record

The Commissioner's duty to develop the record in support of an application for disability benefits begins during the administrative process, before any request for a hearing before an ALJ.  The Commissioner must make "every reasonable effort" to develop the medical evidence in support of an application for disability benefits, including "help[ing]" claimants get medical evidence from their own medical sources.  20 C.F.R. §§ 416.912(b)(1)(i), 416.945(a)(3).

At the hearing level, after the denial of benefits on initial review and reconsideration, an ALJ must act "as an examiner charged with developing the facts" and ensure that every claimant receives a full and fair hearing.  *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S. 389, 411, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)).  Nevertheless, "while the ALJ must ensure that every claimant receives 'a full and

fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant."
*Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (quoting *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); citing 20 C.F.R. § 404.1512(a)), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); *see also* 20 C.F.R. § 416.912(a)(1) ("[Y]ou have to prove to us that you are blind or disabled."); 20 C.F.R. § 416.945(a)(3) ("[Y]ou are responsible for providing the evidence we will use to make a finding about your residual functional capacity.").

In special circumstances, the Sixth Circuit has held that an ALJ must "exercise a heightened level of care" in developing the record. *Lashley*, 708 F.2d at 1051–52. Heightened care applies to unrepresented claimants who are not familiar with hearing procedures and are incapable of presenting an effective case. *See Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051–1052); *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (citing *Duncan*, 801 F.2d at 856). Conversely, a heightened level of care is not owed to unrepresented claimants who demonstrate a grasp of the proceedings and adequately present their cases, *see Moats*, 42 F.4th at 564; *Wilson*, 280 F. App'x at 459, or to claimants who are represented by counsel, *see Stevenson v. Kijakazi, Stevenson v. Kijakazi*, No. 5:20CV2688, 2022 WL 4551590, at *13 (N.D. Ohio Sept. 29, 2022).

Here, the Commissioner ordered a psychological consultative examination and used the information provided by Ms. Butcher to request and obtain the medical evidence considered at the initial and reconsideration levels. (*See* Tr. 309-12 (Plaintiff's 06/08/2020 summary of providers), Tr. 162 (summary of evidence considered in 8/18/20 initial determination), Tr. 483-89 (10/22/20 consultative examination), Tr. 167-68 (summary of evidence considered in 11/3/2020 initial determination), Tr. 324-25 (Plaintiff's 12/10/20 summary of providers), Tr.

176-77 (summary of evidence considered in 02/25/2021 reconsideration determination).  There is

no dispute that the Commissioner properly developed the record at the administrative level.  Ms.

Butcher also obtained counsel after her claim was denied on reconsideration and has been

represented since September 2020.  (Tr. 196-99, 272-75, 858-61.)  There is no dispute that the

ALJ did not have a heightened duty of care to develop the record.

Ms. Butcher does not assert that the ALJ had a heightened duty of care to develop the

record, but still argues that the ALJ had a duty to order a consultative examination to assess

whether a cane was "medically necessary" in this case because the ALJ relied on state agency

medical opinions that were 2.5 to 3 years old and "mischaracterized the evidence post-dating the

reviewer opinions, and thus did not properly consider it."  (ECF Doc. 8, p. 13.)  In other words,

she argues that the ALJ's mischaracterization of records post-dating the state agency medical

opinions created an affirmative duty for the ALJ to order a new consultative examination or

medical opinion.  This argument is not consistent with applicable law.

### 2.    ALJ Has Discretion in Ordering Consultative Examinations

First, the regulations governing consultative examinations provide that an ALJ "may"

order a consultative examination if the medical record is insufficient.  20 C.F.R. § 416.912(b)(2);

*see also* 20 C.F.R. §§ 416.917, 416.945(a)(3).  The Sixth Circuit has confirmed that it is within

an ALJ's "discretion to determine whether further evidence, such as additional testing or expert

testimony, is necessary."  *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y

of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an

ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if

the existing medical sources do not contain sufficient evidence to make a determination."); *see

also Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty

to develop the record" does not necessarily "require the ALJ to order a consultative

24

examination").  A consultative examination may be appropriate "to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis," where such evidence is not contained in a medical source's records or where the medical source's evidence "cannot be obtained for reasons beyond [the claimant's] control."  20 C.F.R. § 416.919a(b).

Even setting aside the fact that any decision to order a consultative examination is discretionary, it is notable that Ms. Butcher does not argue—and did not argue before or during her administrative hearing—that the existing medical records were insufficient or that she was unable to obtain needed evidence for reasons beyond her control.  (Tr. 730-31, 759, 904-06.) Certainly, her representative did not ask the ALJ to order a consultative examination or assist in gathering additional medical opinion evidence, even after hearing the VE's testimony regarding the impact of a cane on the ability to perform light exertional work.  (Tr. 759.)

"Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record and later fault the ALJ for not performing a more exhaustive investigation."  *See Campbell v. Comm'r of Soc. Sec.*, No. 1:12CV1406, 2013 WL 1908145, at *8 (N.D. Ohio May 7, 2013) ("At the hearing, counsel did not indicate or suggest to the ALJ that any medical records were missing from the administrative record, nor did counsel ask for the ALJ's assistance in obtaining any additional medical records.") (*citing Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004)); *Hopkins v. Comm'r of Soc. Sec.*, 96 F. App'x 393, 395 (6th Cir. 2004) (finding the ALJ did not need to request additional testing where claimant was represented by counsel, did not request additional testing at the hearing, and had conditions that were well documented on the record).

### 3.  ALJ Did Not Have a General Obligation to Replace "Stale" Opinions

Instead of arguing that a consultative examination was required to fill noted gaps in the medical records, Ms. Butcher appears to argue that the ALJ had a duty to obtain a new medical

opinion regarding the medical necessity of her using a cane because the ALJ relied on the opinions of state agency medical consultants who did not consider "the nine subsequent references to Plaintiff's cane usage during the relevant period."  (ECF Doc. 8, p. 14 (citing *Holt v. Saul*, 2:19-CV-00125, 2021 WL 9526902 (E.D. Tenn. Jan. 8, 2021)).)  This argument, that a new medical opinion was required because the opinions in the record are dated and do not address all of the relevant evidence, is not consistent with governing Sixth Circuit precedent.

The principal that an ALJ is permitted, but not required, to order a consultative examination holds true even when medical opinions in evidence are several years old.  In *McGrew v. Comm'r of Soc. Sec.*, the Sixth Circuit rejected an argument that an "ALJ improperly relied on the state agency physicians' opinions because they were out of date and did not account for changes in her medical condition," finding it sufficient that the ALJ considered later medical examinations and assessments and "took into account any relevant changes in [the claimant]'s condition."  343 F. App'x 26, 32 (6th Cir. 2009).

While the Sixth Circuit held in *Blakley v. Comm'r of Soc. Sec.* that there must be "some indication that the ALJ at least considered" medical evidence that post-dates a non-examining source opinion, the *Blakley* court did not hold that such consideration must be supported by a new medical opinion.  581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).  District courts have therefore concluded that "[a]n ALJ need not 'obtain[] updated opinion evidence, so long as the ALJ's ultimate decision is supported by substantial evidence."  *Davidson v. Comm'r of Soc. Sec.*, No. 3:22 CV 938, 2023 WL 5948122, at *4 (N.D. Ohio Sept. 13, 2023) (quoting *Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19 CV 2844, 2020 WL 7769729, at *12 (N.D. Ohio Dec. 30, 2020) (citing *McGrew*, 343 F. App'x at 32)).

The Sixth Circuit also does not require an ALJ to "get the opinion of another physician before setting the [RFC]." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).  The court has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Id.* at 401–02 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442–43 (6th Cir. 2017) *and Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)); *see also Van Pelt*, 2020 WL 7769729 at *10-11 (finding *Mokbel-Aljahmi* to be "contrary" to an argument that "the lack of any medical opinion evidence for . . . physical impairments, apart from two outdated opinions from non-examining physicians, denotes a lack of substantial evidence supporting the RFC").  Governing Sixth Circuit law therefore does not support Ms. Butcher's argument that the ALJ had a duty to further develop the record because the state agency consultants did not consider subsequent evidence regarding her use of a cane.

Ms. Butcher's citation to *Holt v. Saul*, *Holt v. Saul*, No. 2:19-CV-00125, 2021 WL 9526902 (E.D. Tenn. Jan. 8, 2021), does not alter this analysis.  The court in *Holt* found that an ALJ deprived a claimant of a "full and fair hearing"—and was therefore obligated to order a new consultative examination—when the claimant's medical condition underwent "significant change" in the two years after the state agency opinions.  *Id.* at *7.  Although *Holt* does not specifically cite to it, the court's analysis appears to follow a line of district court cases which held that an ALJ should obtain an additional medical opinion when the only medical opinion in evidence is an "outdated" opinion from a non-examining source.  *See Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008); *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011).  However, many courts in this district have declined to follow the *Deskin/ Kizys* standard.  *See, e.g., Carr v. Comm'r of Soc. Sec.*, No. 5:23-

27

CV-00187, 2024 WL 1343473, at *5 (N.D. Ohio Mar. 30, 2024) (collecting cases).  As one court explained:

> *Deskin* is a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law . . . By requiring an ALJ to secure a medical opinion whenever the record does not contain such an opinion, subject to only limited exceptions, *Deskin* places a higher burden on the ALJ than the Sixth Circuit does.

*Winans v. Comm'r of Soc. Sec.*, No. 5:22-CV-01793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023).  Instead, courts have held that "[a]n ALJ need not 'obtain[] updated opinion evidence, so long as the ALJ's ultimate decision is supported by substantial evidence." *Davidson*, 2023 WL 5948122 at *4.  The undersigned therefore turns to whether the ALJ in this case failed to meet his duty to develop the record, i.e., failed to provide a "full and fair hearing" to Ms. Butcher, because he rendered a decision that lacked the support of substantial evidence.

### 4.    ALJ Decision was Supported by Substantial Evidence

Ms. Butcher argues that the ALJ lacked the support of substantial evidence when he relied on the state agency medical consultants' opinions in adopting a light RFC that did not require the use of a cane because: (1) the state agency opinions were 2.5 to 3 years old; (2) one state agency consultant noted that Ms. Butcher "does not use any devices for assistance" (Tr. 181); and (3) the ALJ "mischaracterized the evidence post-dating the reviewer opinions, and thus did not properly consider it" when he asserted that the record contained only one documented report of Ms. Butcher using a cane during the relevant time.  (ECF Doc. 8, pp. 12-13.)  As discussed above, neither the age of the state agency opinions nor the fact that the consultants did not review the full medical record is enough to require the ALJ to order a new consultative examination.  That leaves one question for resolution here: Did the ALJ's mischaracterization of the records so taint Ms. Butcher's "full and fair hearing" that the error imposed an affirmative duty on the ALJ to further develop the record by ordering a consultative examination.  For the

reasons set forth below, the undersigned concludes that the record does not support such a duty in this case.

As an initial matter, there is no question that the ALJ misstated the number of medical records where providers observed Ms. Butcher using a cane.  It is undisputed that the ALJ made the following misstatements in his decision:

- "The claimant does report periodic use of a cane, and there is *one* documented treatment note that observes this use" (Tr. 708 (emphasis added));

- "It is *not until March 2023* that the claimant's use of a cane is documented" (Tr. 712-13 (emphasis added)); and

- "The *only* documented use of a cane is in one recent visit" (Tr. 714 (emphasis added)).

Both parties agree that these statements were in error, and that the evidentiary record instead contains a total of six medical records documenting provider observations of Ms. Butcher using a cane, with three additional records referencing her self-reported cane use, as follows:

- Physical examination findings by PA Carpenter at pain management visits on August 3 and 31, September 21, and October 16, 2021 (Tr. 946, 951, 956, 961);

- Examination finding by NP Tudhope at mental health medication management appointment on November 21, 2021 (Tr. 1314-15);

- Examination finding by Dr. Dorsett at a neurology office visit on March 16, 2023 (Tr. 1940), this being the appointment acknowledged by the ALJ;

- Self-reported problem in pain management visit with PA Carpenter on February 2, 2023 (Tr. 1996), but with examination findings showing that she ambulated unassisted with a slow gait (Tr. 1998); and

- Self-reported presenting problem in tele-health therapy visit with LPCC Sherrod on June 7, 2022, and May 25, 2023 (Tr. 1401, 1599).

(*See* ECF Doc. 8, p. 12; ECF Doc. 9, pp. 3-4.)

Despite these acknowledged misstatements, the Commissioner argues that the ALJ's decision was supported by substantial evidence because Ms. Butcher did not "meet her burden of

proving that her use of a cane was medically necessary" and was "unable to point to any clinical evidence" demonstrating medical necessity.  (ECF Doc. 9, p. 1.)  "Notwithstanding a factual error by the ALJ regarding the instances in which Plaintiff's medical records document her using . . . a cane," the Commissioner argues that "substantial evidence supports the ALJ's finding that the use of a cane was not a medical necessity."  (*Id.* at pp. 7-8.)  "Medical necessity" is central to Ms. Butcher's assignment of error, since her arguments for relief are premised on the assertion that an additional RFC limitation requiring the use of a cane for balance and ambulation would have been "outcome determinative" for her claim.  (ECF Doc. 8, p. 11.)  The Commissioner is therefore correct that the question before this Court is whether the ALJ was supported by substantial evidence when he effectively found the cane was not medically necessary.

The Sixth Circuit has explained that a cane "cannot be considered an exertional limitation" in an RFC if the cane "was not a necessary device for claimant's use."  *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002).  Under Social Security Ruling ("SSR") 96-9p, an ALJ may only find a cane to be medically necessary where the record contains "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  SSR 96-9p, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

Courts in this district have held that the "medical documentation" required by SSR 96-9p does not include mere "notations relating to a claimant's continued use of an assistive device." *See Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 WL 2988346, at *8 (N.D. Ohio Mar. 22, 2023) (collecting cases) ("[T]he fact that various physicians noted Mr. Barnes' use of a cane or a walker does not establish that an assistive device was medically necessary for

purposes of SSR 96-9p."); *Phillips v. Comm'r of Soc. Sec.*, No. 5:20-CV-01718-CEH, 2021 WL 5603393, at \*10 (N.D. Ohio Nov. 30, 2021) ("Although various medical records note that Claimant presented at appointments using a cane, these notations do not meet the requirements of SSR 96–9p.").  This is consistent with the Seventh Circuit's holding that SSR 96–9p requires an "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary."  *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012); *see also Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) ("[T]he legal issue does not turn on whether a cane was 'prescribed' for Spaulding, but whether a cane was 'medically required.'); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (finding prescription and references to use of cane without discussion of medical necessity to be insufficient to show medical necessity).

Here, the ALJ provided the following analysis of Ms. Butcher's cane usage:

> Regarding the claimant's use of a cane, she had reported using it intermittently in January 2020, prior to the relevant period, and only rarely as of the start of the relevant period [].  The record generally does not report use of a cane and consistently documents an unassisted gait, albeit slow, throughout most of the relevant period thereafter.  It is not until March 2023 that the claimant's use of a cane is documented; although, during the visit with the same physician the month before, there was no mention of a cane and her gait was observed as normal [].

(Tr. 712-13 (citing Tr. 981 (1/27/20), 969 (6/1/20), 1951 (2/2/23), 1940 (3/16/23).)  As discussed above, the ALJ erred in stating that Ms. Butcher's only documented use of a cane was in March 2023.  In fact, the records show that her pain management provider also documented her use of a cane in August, September, and October 2021, and her mental health provider noted her use of a cane in November 2021.  (Tr. 946, 951, 956, 961, 1314-15.)

Ms. Butcher argues that the additional records are significant because they "show[] she has consistently been using her cane . . . since around August 2021, two months after [the ALJ]'s last vacated decision."  (ECF doc. 8, p. 12.)  Conversely, the Commissioner asserts "[w]hile there are, arguably, up to nine instances in 1,510 pages of medical evidence documenting

Plaintiff['s] use of a cane, most medical evidence documents no such use or need," noting that

"Plaintiff has pointed to no prescription for a cane, medical recommendation that she use a cane,

or statement about under what circumstances she may need to use a cane."  (ECF Doc. 9, p. 10

(citing Tr. 496, 918, 923, 929, 934, 966, 982, 997, 1002, 1008, 1300, 1306, 1432, 1454, 1489,

1516, 1532, 1559, 1584, 1624, 1951, 1998).)

    The Commissioner is correct that most of the medical records do not support a need for a

cane.  (*Id*.)  As discussed in more detail in Section II.B.1, *supra*, the medical evidence generally

supports the ALJ's assertion that the record consistently—but not universally—documented an

unassisted gait (*see, e.g.*, Tr. 496, 918, 923, 929, 934, 966), and normal strength, sensation, and

muscle tone in the lower extremities (*see, e.g.,* Tr. 617, 623, 1940, 1951).  Abnormal findings

were generally limited to pain with rotation, decreased range of motion in the lumbar spine,

occasional decreased sensation, and paraspinal hypersensitivity on the right side.  (*See, e.g.*, Tr.

918, 923, 929, 934, 946, 956, 961, 966, 1951, 1998.)  The ALJ also noted Plaintiff's testimony

that she could perform light housework, travel, and engage in other activities (Tr. 711)[6] and

accurately summarized the relevant medical evidence, including the evidence post-dating the

state agency opinions (Tr. 711-12).  Thus, while the ALJ clearly failed to acknowledge five

additional treatment visits where Ms. Butcher was observed using a cane, the remainder of his

analysis relating to her gait and use of a cane was consistent with and supported by the record.

    The mere presence of a factual error in an ALJ's decision does not require reversal.  A

factual mistake may be considered harmless—and thus not a basis for reversal—where the ALJ's

assessments and decision as a whole are supported by substantial evidence.  *See Ulman v.*

---

[6] Contrary to Plaintiff's assertion, the ALJ did not "reject" her October 2023 testimony that she had "no choice" but to use a cane. (ECF Doc. 8, p. 11 (citing Tr. 739).)  The ALJ references her testimony in his decision, noting that plaintiff "uses a cane at times and has done so on and off for many years."  (Tr. 711.)  This is almost a direct quote of Ms. Butcher's testimony that she had "used a cane on and off for maybe ten years."  (Tr. 738.)

*Comm'r of Soc. Sec.*, 693 F.3d 709, 712–13 (6th Cir. 2012); *Hickerson v. Comm'r of Soc. Sec.*,

No: *Hickerson v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-01678, 2021 WL 8342806, at *13–

14 (N.D. Ohio Nov. 3, 2021), *report and recommendation adopted sub nom. Hickerson v.*

*Comm'r of Soc. Sec.*, No. 3:20-CV-1678, 2023 WL 6348206 (N.D. Ohio Sept. 29, 2023);

*Cameron v. Comm'r of Soc. Sec.*, No. 1:15-CV-169-HSM-SKL, 2016 WL 11431681, at *7 (E.D.

Tenn. Apr. 12, 2016), *report and recommendation adopted sub nom. Cameron v. Colvin*, No.

1:15-CV-169, 2016 WL 4094884 (E.D. Tenn. Aug. 2, 2016).  This is because the evidence in the

record must be "taken as a whole" in determining whether the Commissioner's findings are

supported by substantial evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) (citing

*Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980)).

  Here, the ALJ made several inaccurate statements regarding the number of times Ms.

Butcher was observed using a cane, acknowledging only one instance and ignoring five

additional instances over three years of treatment visits.  But those provider observations that

Ms. Butcher was using a cane do not supply the "medical documentation" required to establish

medical necessity under SSR 96-9p, regardless of whether there was one provider observation or

six.  *See* SSR 96-9p, 61 Fed. Reg. at 34482; *Barnes*, 2023 WL 2988346, at *8; *Phillips*, 2021

WL 5603393, at *10.  Ms. Butcher has not identified additional evidence in the evidentiary

record that would support a finding of medical necessity under SSR 96-9p, and the undersigned

is aware of none.  This situation is similar to that faced by the Tenth Circuit in *Spaulding*, 379 F.

App'x at 780, where the ALJ had made a "factually inaccurate" statement that the record did not

contain a prescription for a cane.  The Tenth Circuit explained that it would hesitate to remand

on the basis of that factual error alone because "the legal issue does not turn on whether a cane

was 'prescribed' . . ., but whether a cane was 'medically required'" and the claimant did not

"point to specific record evidence that would satisfy the medical necessity standard." *Id.*

Turning back to the issue raised by Ms. Butcher's assignment of error—whether the ALJ

failed in his duty to develop the record when he did not order a new consultative examination to

assess whether Ms. Butcher's use of a cane was medically necessary—the Sixth Circuit has held

that an ALJ must act "as an examiner charged with developing the facts" and ensure that every

claimant receives a full and fair hearing, *Lashley*, 708 F.2d at 1051, but it has also emphasized

that "the ultimate burden of proving entitlement to benefits lies with the claimant," *Moats*, 42

F.4th at 563.  Here, Ms. Butcher bore the burden to show that it was "medically necessary" for

her to use a cane for balance and ambulation.  She failed to do so.  *See, e.g., Stupka v. Saul*, No.

1:19-CV-2305, 2021 WL 508298, at *4 (N.D. Ohio Feb. 11, 2021) (rejecting plaintiff's

argument that she required a cane for ambulation where the only evidence suggesting she needed

a cane was her documented back pain, her doctor's observation of her using a cane, and hearing

evidence that she was using a cane); *Strain v. Comm'r of Soc. Sec. Admin.*, No. 5:12-CV-1368,

2013 WL 3947160, at *3 (N.D. Ohio Aug. 1, 2013) ("Although Strain can demonstrate that she

uses or has used a cane, she does not provide evidence that she required use of the cane.").

While the ALJ made a clear factual misstatement in discussing the medical records, his

misstatement was not material to the legal question at issue—whether Ms. Butcher's use of a

cane was medically necessary.  Even if the ALJ had more accurately characterized the records

describing Ms. Butcher's observed use of a cane, the evidence as a whole could not support an

RFC requiring use of a cane for balance and ambulation.  Because the evidentiary record does

not support the adoption of the RFC limitation that Ms. Butcher asserts would have been

"outcome determinative" of her claim, and because the ALJ's findings regarding the medical

necessity of Ms. Butcher's cane usage were supported by substantial evidence, the undersigned concludes that the ALJ's misstatement was a harmless error.  *See Ulman*, 693 F.3d at 712–13.

For the reasons set forth above, the undersigned finds that Ms. Butcher's sole assignment of error lacks merit.  She has not shown that the ALJ erred when he did not obtain additional medical evidence, and she has not demonstrated that he lacked substantial evidence to support his adoption of the relevant RFC without first seeking additional medical opinion evidence.

## VII.  Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

November 26, 2024

/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).